Thank you, Your Honor. I may please the Court. Michael Kemp, I appear on behalf of Appellant. Your Honors, in this case, it is almost as important to define what the issues before the Court are not as it is to define what the issue before the Court is. The issue before the Court is not whether or what there was a COVID-19 pandemic. The issue is not whether the state had the ability and maybe the duty to do something to protect its citizens against that pandemic. And the issue is not whether the state can delegate emergency powers to the governor. The issue before the Court is whether the particular actions complained of in this case meet constitutional muster. In this case, they don't. An appellant seeks remand of the order dismissing the case because of the numerous constitutional violations of the executive orders at issue. We're going to focus an argument here today on two of them. First, focusing on the contract's claims. And second, on the right of access to the courts. Before we get to that, can we talk a little bit about what's actually in front of us now? I'm sure you saw the motion to dismiss. Why isn't, at least for injunctive relief, since the executive orders have been superseded and appear to be phasing out, why isn't the injunctive relief moot? The protections do appear to be phasing out, Your Honor. The only remaining protections for tenants is for any tenant who has applied for assistance under various programs of rental assistance through the state. Which is significantly narrower than the prior executive orders, correct? That is true. It is. So isn't the injunctive relief moot? No, the injunctive relief is not completely moot. The injunctive relief is moot in certain ways because some of the issues that we had brought up, for instance, protections for the lease that were unrelated to non-payment of rent, those issues have simply gone away. They're no longer before the court. Isn't though the remedy, this comes from the recent gun case from the Supreme Court, the remedy here in those circumstances where things have materially changed, is to send this case back to the lower court, at least with respect to the injunctive and declaratory relief, so that you can replete and develop the record on this particular limitation. The limitation you challenged below is now gone. So now we have a new limitation. So shouldn't we send it back down for the district court and for the parties to deal with it? Yes, we should, John. And as the courts pointed out, and I think as General Ellison has pointed out in the brief for Pelley's, in this case, there have been numerous different executive orders modifying each other, each state action, but each slightly different. Now there is legislation, again, still state action, still subject to constitutional review, but slightly different. The appropriate thing is to send it back down to the court and have the court look at, should the injunction, if any, be issued and under the particulars of the facts that are now presented. But part of that is also to say it's moot. And I understood you, that was the remedy they gave for a moot issue, the Supreme Court gave for a moot issue. And I understood you to be responding to Judge Grunder saying, no, it's not moot. So there's an inconsistency there. There are some issues, I agree, there are some ways that we had originally pled this back in September of 2020, that due to the fast-changing nature of the pandemic and the pandemic, that there are some things we initially pled that we simply can't get anymore, in this case, as the Pelley's have pointed out, because we've already gotten them. Let me ask you this, and this gets to what's before us, too. Let's take the injunction, the declaratory judgment, all that off the table. Is there a claim for compensatory damage? I saw that nobody really litigated it below. So is that before us today, the claim for compensatory damages? It would be undermanned, Your Honor, for two reasons. First, the takings clause violation is a violation that comes along with the claim that there should have been monetary compensation for the loss of use of the property by the power of the State. Second, 1983 claims are claims that can involve compensatory damages and other damages. Now, official capacity claims for damages would be forbidden under the 11th Amendment, right? Official capacity claims for, essentially, for injunctive relief, for prospective injunctive relief. Taking off the table the injunctive, as Judge Strauss just suggested, I think, and you correct me if I'm wrong, but under the 11th Amendment, official capacity claims, you can't get damages. Correct. Okay. So did you plead individual capacity as well? Yes, we did. Individual capacity claims both against Governor Walz and against General Ellison as the people who both promulgated these executive orders and enforced them. So then we have to turn to, is there actually still a live claim under, as we're going to focus on here, the contracts claim and the First Amendment claims? Turning first to the contracts claim, we've already fully briefed the issue of the absolute prohibition under the plain language of Article I, Section 10. So I'm going to address the point that the Court below brought up and appellees put before the Court, which is under the Supreme Court's precedence, Spine B. Mellon being the sort of most prominent here. What is the test that this Court has to look at to determine whether there was a constitutional violation of the contracts clause? Under these two parts, the question is going to be whether there was a significant impairment of appellant's contracts with its tenants. And second, if so, was that impairment done by a legislation or executive order that is reasonably and appropriate to a legitimate and public purpose? No one disputes here that combating the pandemic is a legitimate public purpose. So what we're looking at is that first part, reasonable and appropriate. The Court below said there was no significant impairment of the contracts. It's hard to credit this argument looking at what the contract for tenancy is for. I thought the District Court said in the order that we're going to assume without deciding there's a significant impairment. There may have been language suggesting that, but I thought the order actually sort of assumed it away. Your Honor, that may be right. The Court expressed, I should say, significant doubt that there was impairment and appellees argued that there has been none. The Court did say, assuming that there has been, we should also examine on this second prong. But this Court, of course, reviewing this de novo, has to conclude as a threshold matter whether there was substantial impairment. In this case, substantial impairment, what we're looking at is whether the executive orders undermine the contractual bargain, whether it prevents or interferes with the contractual expectations, whether it prevents property owners, in this case, from safeguarding their rights or reasserting their rights. Unquestionably, these executive orders did. In all but the most extreme circumstances, tenants were allowed to continue in possession of a property no matter what they did. This is not a case just involving non-payment of rent. Landlords are simply unable to enforce their leases. Now, this is important not only because it affects the landlords, but it affects other tenants. Your Honor, if I'm an asthmatic and I go intentionally into a non-smoking property and my neighbor is smoking in the hallway, the landlord can't do anything about it. I can't do anything about it. If I have a significant allergy to pets and I go into a pet-free building, the landlord can't do anything about the fact that I may suffer a significant allergic reaction to somebody who has brought pets in. If I have a job that starts at 4 in the morning, the landlords can't do anything about any tenants who are throwing parties until 3 a.m. As we put in the complaint, added specific examples of, for instance, one of the tenants in one of these properties here at issue was running a mechanic's station out of the parking lot of the apartment building, taking up lots that maybe other tenants were paying for certainly that other tenants were expecting to be able to use. There's nothing the landlord could do under these executive orders to enforce the rules that other tenants expect and that the landlord expects. That's a significant impairment because there's no way to protect the rights and the reasonable expectations that all the parties entered into. What about Jacobson? What about the deference that many courts, and maybe you're arguing that it doesn't apply here, but many courts have given to these types of orders? I'm absolutely arguing it does not apply here, Your Honor. I'm following, in fact, I'm leading, but I think Justice Gorsuch would be the primary person to look at, not me, in terms of what the arguments are for Jacobson. As Justice Gorsuch pointed out and is noted in our briefs, Jacobson has been made out by governments across the country as a sort of towering icon of the sort of executive power or state power that states can execute in their police power and it's simply not. Reading Jacobson, it was for most of its life until this pandemic, a fairly commonly cited but unimportant proposition that states have police power, not, as it's been cited here, that states can do anything they want in a pandemic. What do we do with Rutledge then? Rutledge was decided early on, Your Honor, and it was simply incorrectly decided. Well, yeah, but we can't overrule another panel, right? So, I mean, Rutledge sits out there unless we can either distinguish the facts in a way that we would say that analysis is not the appropriate analysis or we can say that, I don't know, maybe in the Catholic Lord has indicated that there's a different direction that we have to go in and that it's been, as a precedent, it's been called into question by a subsequent perceived Supreme Court precedent. But, I mean, right now, Rutledge is just sitting in a room like a big old elephant and what's your best argument for us to just ignore it? It wouldn't be to ignore it, Your Honor. It would be to say that the Supreme Court has looked at Jacobson and has disagreed with his circuit, respectfully has disagreed with his circuit on the application of Jacobson. You can look at Catholic Diocese of Brooklyn and Newsom and these cases that have come out since interpreting Jacobson for that proposition. I want to turn very briefly and then reserve my remaining time for rebuttal to note that the Petitions Clause is a second issue that we have before us. And what we are looking at here is not a question of a preferred remedy for property owners or a temporary delay. Twenty-seven months is how long these prohibitions are going to, the last of these prohibitions is going to have lasted. Sixteen months is the shortest time period these executive orders close the doors of the courthouse to all but the most extreme examples of breaches of lease. Well, Counsel, I wanted to ask you about that. So I don't know exactly what the access to court's right is because it seems to be grounded in half the Constitution. But it seems to me that it doesn't cover this situation, which is you have a remedy. It seems to me to cover a situation in which there is no remedy whatsoever. And the remedy here is you can still go to court, you can still file an action, it just so happens you can't get an eviction, at least in those circumstances, you can only get unpaid rent. Why isn't that good enough to provide access to courts? Because it shows a fundamental misunderstanding of what the eviction process does. The eviction process in Minnesota is not about money. It's never about money. The eviction process puts the keys to that rental property on the table and determines who walks away with those keys and that's it. So for, for instance, material breaches of the lease unrelated to rent, there's absolutely no remedy in conciliation court. There's no remedy in district court. There's no remedy at all. So your position would be if the Minnesota legislature tomorrow eliminated the eviction remedy, because evictions are set up in the Minnesota statutes, that would be a violation of the access to courts or the petition clause. Completely eliminated it. No, it wouldn't. There would be other constitutional problems with eliminating that, but at that Mr. Goodwin, we'll give you a minute. We used a lot of your time at the end there, so we'll give you a minute on rebuttal. Thank you, Your Honor. Mr. Kemp. Morning, Mr. Goodwin. Good morning, Your Honors. May it please the court, my name is Michael Goodwin and I'm representing the Governor and the Attorney General in this matter. This case is about an emergency public health measure that has been crucial to controlling the spread of one of the deadliest pandemics in history. It is also plainly constitutional under established precedent. What the appellant is asking this court to do is ignore the precedent and ignore the conclusions of federal courts around the country that have considered and rejected these very claims. Instead, the court should affirm the district court's dismissal of these claims and find that they are not cognizable under any standard that applies. Your Honor, I'll start with the contracts clause. First of all, this court is required to use the Supreme Court's framework, which was reaffirmed as recently as 2018. That requires that the appellant show a substantial impairment. The district court did find substantial impairment at addendum pages 38 and 39, or excuse me, found that it was not a substantial impairment, pages 38 and 39, and that was the correct conclusion. A substantial impairment in this case is either reduced or extinguished, and that language comes from Blaisdell. These executive orders do nothing of that kind. The leases, the contracts in this case, remain intact. The tenants remain subject to them. It's also worth noting, Your Honor, on the substantial impairment that the court also looks at the regulated nature of the industry. Housing is one of the most regulated industries in the country. In this case, the landlords actually closed on their property after the executive orders went into effect. You know, but there's a recognized fundamental right to exclude others from the property, right? When you're sitting there and you're looking at this thing and saying somehow money damages for non-payment of rent that goes on for months, maybe years, is somehow adequate, how is that protecting the right of exclusion and the right to possession, which clearly is contemplated in any lease, right? I mean, the landlord retains some right to the property, right? You know, now in some things, like I think it's a red herring to talk about the guy running an automobile repair shop in a parking lot, because you can still go in and get injunctive or some kind of declaratory relief, you know, that's still possible. But there's nothing you can do to get your property back. And you're dealing with a bunch of guys that they're not all major corporations that can afford to go years without getting paid, right? And the idea that somehow you can garnish their wages and they'll pay you $42.73 a month until the end of time is somehow adequate when they're racking up $1,000 a month in this case. It just seems to me that there's got to be something there. Well, Your Honor, I don't think I would argue that the eviction remedy is irrelevant. Certainly, the contracts, there's some impairment. Isn't that substantial? If they could take your property from you for years, that that somehow, you know, and even now in the statute, you only get your property back if you say, I want to move in there with my family. That's not the only exception, but if they're laying waste to the property, you can get them out of there. But generally speaking, you're still not able to occupy the property if they've got their application pending and, you know. Sure, which should take care of any nonpayment cases. So you don't have a situation where a landlord is in fact waiting for years. And in this case, I believe the executive order that are at issue were only in effect for 15 months. We're not talking about what is commonly called the off-ramp. That's not before the court today. All we're talking about is the executive orders that were in effect for about 15 months. And so I take the court's point that certainly landlords expect to be able to evict when they, when they sign those contracts if certain conditions aren't met. But what the Supreme Court says is that the contracts have to be rendered invalid, released, or extinguished. The executive orders don't do that. And in fact, they specifically say there's nothing that impairs the tenant's obligation to pay rent. And I think it's highly questionable as well that a judgment, conciliation court or otherwise, or as the court pointed out, some kind of a court order for injunctive relief to, you know, tell the guy to close his auto business. I think that's highly questionable. If a court order telling somebody not to do something is meaningless or irrelevant, that strikes me as hugely problematic for our judicial system. Well, you mentioned the 15-month thing. But my understanding was it wasn't clear it was going to be indefinite, potentially, and as long as the pandemic was bad. So we, you know, to add to Judge Erickson's point, you know, from the landlord's perspective, this looked, gosh, this could go on forever. I might be getting $100 a month from my tenant if I'm lucky, and I have to keep that tenant in my, in that particular apartment and pay all my bills too. I mean, doesn't that seem, again, doesn't that seem like a substantial impairment at that point? I don't think it's a substantial impairment within the meaning of Blaisdell. And I would note that Blaisdell involved a Minnesota law that prevented banks from foreclosing for up to, I believe, two years. And so that's a similar situation in which the bank isn't getting their money, right? And they expect to get their money, but they can't, quote, do anything to get their money immediately. They can get it later. But, you know, I guess as to the indefinite nature of the, as to the indefinite timeframe, sure, we, I don't think anybody really knew at the time that it, that the EOs went into effect that they'd be in effect as long as they were. But under state law, the governor has to review that every 30 days and sort of re-declare the peacetime emergency. And so the governor has to, there isn't just sort of this perpetual, this perpetual nonstop process. The governor has to, under state law, review that situation. And it's subject to termination by the legislature. So if at some point the legislature says the governor has, this has gone on long enough, as some legislators certainly did, and as the legislature in this case eventually did, then that, I think that that goes to the indefinite nature of it. It wasn't, it wasn't set up as something that, that, you know, we're going to prohibit this until we tell you otherwise. It was... I was going to ask this question, but it's coming up now in terms of your response. I was going to ask it later. I actually think there's a claim here that isn't being focused on, that is pleaded, that is problematic for the government's position, which is the non-categorical regulatory taking. And what you, what your response is actually convincing me of, and I don't think you mean to be doing this, is that the investment-backed expectations are completely destroyed. If I am a, if I'm trying to sell an apartment complex and these restrictions are looming over, overhead, I'm quite positive you can't get the same amount of money while these restrictions are in place as you could otherwise. And I'm quite sure that the stream of income is going to be much less when people are not paying rent than when they're paying rent. So my question for you is, on a motion to dismiss, why on earth did the district court dismiss the non-regulatory, or the regulatory non-categorical taking? Sure. Your Honor, I think there's simply not enough in the complaint to, for the court to find a non-categorical regulatory taking. We have no information as to the economic impact of the regulation. And what the court has to look at for the economic impact is they have to compare the value before and compare the value after the regulation went into effect. We have no information about that in the complaint. As to reasonable investment-backed expectations, I think it's highly relevant that the, that the property actually did sell after the regulation went into effect. And so I think it's really hard to say for Heitz to say that it's reasonable investment-backed expectations are impaired by this temporary limitation on its right to evict. But again, we look at it from the beginning when we don't know if it's going to be indefinite. That's got to play a role in this as well. I suppose it could play a role, Your Honor, but the fact is it was not indefinite. And I don't think there's anything in the record that says, I mean, first of all, there's definitely not anything in the record that says Heitz value was impaired because, in fact, it bought the property after the regulation went into effect. Do they have to show that, I guess the question you're talking about evidence for with the motion to dismiss the case, do they have to show what the amount would be? Like, you know, pre-pandemic, it would have been a $10 million apartment complex. Post-executive order, it's a $4 million apartment complex. Is that the level of detail we would require in a pleading? Well, the factual allegations in a pleading have to push the claim into the plausibility realm. Here, all we have pled in the complaint is that four of, I think, 17 tenants are misbehaving. And I don't discount that that's a problem for the landlord, but as to economic impact, the law is pretty clear that you have to do some kind of an analysis of the value before and the value after. It's not even pled in the complaint that the value of the buildings has diminished. And so I don't think, I think that's just a straight-up, that's just a straight-up Iqbal Twombly analysis as to the economic impact. I want to talk a little bit about the third Penn Central Factor, though, because I think that's really important as it relates to this regulation. The third Penn Central Factor requires the court to look at the character of the government regulation. In other words, what kind of a rule here, what kind of a regulation is this? This is a public health regulation that... Yeah, and I get that. And I was going to ask this, but I just want to take your last minute, so I'm going to take this middle minute. It's got to be reasonably and narrowly, or reasonably and appropriately tailored, right, that this health regulation, doesn't it? That's actually not true, Your Honor. That's not true? What's the standard then? It's, well, so what the Lingle case that's cited in our brief says is that there's no means and ends test. The tailoring, the tailoring of the government regulation doesn't play into this character factor. What the court looks at is, is this the kind of thing that's traditionally, that's sort of been traditionally thought of as a taking? Well, you know, and I guess that's right, but I keep looking at what ordinarily happens in epidemic and pandemic cases. And if you look at the history, you go back to 1919, you go back to 1920. Orders were directed at communities, they were directed at neighborhoods. There was no orders that were directed at entire states. And when these executive orders were entered, there were counties in Minnesota at the time that the initial entry was made that there were no known cases of COVID, right? And so at some point, how reasonably tailored is this executive order to meet this public health need? Sure. I think, you know, without conceding that tailoring is necessary, I think this regulation is tailored. And here's how it's tailored. What the governor found in issuing this executive order is that not only is there an economic effect of this pandemic where people are struggling to pay their rent, but also there's this broader public health effect where people who are kicked out of their apartments or residences then have to move into other people's residences or into congregate settings. That in and of itself spreads COVID and the governor wanted to stop that. And I think we, in fact, have a test case just south of the border in Iowa where at one point, and at the time this case was argued below, I think two-thirds of homeless shelter, two-thirds of homeless shelter residents in Iowa had COVID. Here it was only about 8%. And so, you know, I don't think the court can just look at, you know, there were certain counties where there was less of an effect of COVID because COVID doesn't really obey the borders of a county. Somebody who gets evicted in, say, Stearns County might move to Becker County or might have to, somebody who might have to move into a homeless shelter in Stearns County. So that's what, the spread is what the governor was trying to prevent. And to the extent tailoring needs to, to the extent there needs to be a showing of tailoring, I think there's definitely a tailoring to, tailoring to the pandemic here. I see I'm running out of time. If there are no further questions, I will simply conclude and ask that the district court's dismissal of this case be affirmed. And thank you for your time. Can I ask one additional question, sir? So Jacobson, I just want to hear the government's position on Jacobson. I mean, Cuomo didn't rely on Jacobson at all. It just decided the religious gatherings questions without it. What's your view of Jacobson? So first of all, I don't think the court has to decide in this case because the claims fail under any standard. Second, I do think Jacobson remains good law. Neither Roman Catholic diocese nor I believe it's the Tandon case overruled Jacobson. And in fact, I think the court has expressed a general reluctance to overrule cases that aren't sort of fully briefed on the merits. So I don't think those, those cases on the emergency docket did not, certainly did not overrule Jacobson and could not have overruled Rutledge. This panel remains found by Rutledge. Couldn't Rutledge be distinguished on the basis that Rutledge was decided very early on in the pandemic? I don't think so, Your Honor, because I don't think Rutledge, Rutledge seemed to cast the, Rutledge seemed to cast its decision in sort of absolute terms. It is a fact that it was issued early on in the pandemic. But I don't, I don't think that, I don't think that Rutledge itself set any kind of a time limit and seemed to suggest, you know, as Jacobson itself does, that as the government is, you know, the government is responding to facts on the ground. And as long as those facts on the ground are showing a need for government intervention, Jacobson says, Jacobson says that there's some degree of deference. So, to sum up on your point, Your Honor, I think, I think that Jacobson remains good law. The emergency docket cases, which primarily relate to religion, don't change that. And this panel remains bound by Rutledge. Thank you, Mr. Goodwin. Thank you, Your Honors. Mr. Kemp, we'll give you two minutes. Thank you, Your Honor. I want to address three quick points that General Goodwin brought up in terms of the specific areas that we're addressing here. First, he points out that nothing impairs a tenant's obligation to pay rent by the terms of the executive orders. This is certainly true, but doesn't mean much. It's a fig leaf. Because we know, in fact, we've cited this, the statistics in our brief, that as of May 2021, tenants had rung up $150,000 to $55.6 million in rental obligations during this time. Your Honor, in the 16 months that the full executive orders were in place, a small apartment renting for $900 a month would already have exceeded the conciliation court's jurisdiction, and every one of those claims would have to be in district court. This is supposed to be a summary proceeding where landlords have the ability to reinstate their rights by getting possession of the property pretty quickly, not 16 or 27 months later. The second point regarding a question brought up by Judge Strauss about non-categorical takings. In paragraph 60 of our complaint, we do allege the interference with the investment backed expectations because there's going to be a loss of rental income. That loss of interest closed on the property two months after the executive orders were signed. That doesn't mean that the expectation as this property was being valued was happening during this time. Finally, is a question of the standard of review. Because as General Goodwin says, the claims by appellant fail under any standard. The question is what standard of review? Strict is reasonable and appropriate for the contract's claims, rational basis for other claims. Your Honor, this case should be reversed. The order below should be reversed, and we ask this Court to remand for further proceedings. Thank you. Thank you, Mr. Kemp. Thank you, Mr. Goodwin. We appreciate your appearance today and your briefs and arguments. Case is interesting and will be submitted and will issue an opinion in due course. You may be excused.